UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                 :

UNITED STATES OF AMERICA         :
                                   :

            - v. -                    :
                                   :     05 Cr. 1280 (KMK)

VITO FORESTIER,                  :
                                   :

               Defendant.       :
                                   :

                                   :

                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN
OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**


                                       MICHAEL J. GARCIA
                                         United States Attorney
                                         Southern District of New York
                                         Attorney for the United States
                                             of America


BRENDAN R. MCGUIRE
Assistant United States Attorney

       - Of Counsel -

## **TABLE OF CONTENTS**

THE EVIDENCE AT THE HEARING..............................................................................3

    A.    The Testimony of the Police Officers.......................................................3

    B.    The Testimony of the
          Defendant...........................................................................9

    C.    The Testimony of Defense Witness Yvonne Levayan...........................12


ARGUMENT........................................................................................................14

    A.    The Testimony of Officer White, Sergeant Kivlehan and
          Lieutenant McMahon Was Credible and Consistent.............................14

    B.    The Testimony of the Defendant Was Not Credible On
          Its Face And Should Be Rejected By the Court.....................................19

    C.    Defendant's Motion To Suppress Physical Evidence Should Be
          Denied Because The Record Demonstrates That The Officers
          Had Probable Cause To Arrest Him......................................................23

          1.    Applicable Law........................................................23

          2.    Discussion...............................................................24

    D.    Defendant's Written Statement Was Made Knowingly, Voluntarily,
          And Intelligently, And Was Not Coerced...............................................27

          1.    Applicable Law........................................................27

          2.    Discussion...............................................................28

    E.    Defendant's Post-Miranda Written Statement Should Not Be
          Suppressed Based Upon His Pre-Miranda Oral Statements.................31

          1.    Applicable Law........................................................32

          2.    Discussion...............................................................37


CONCLUSION....................................................................................................40

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
UNITED STATES OF AMERICA                            :
                                                    :
          - v. -                                    :
                                                    :        05 Cr. 1280 (KMK)
VITO FORESTIER,                                     :
                                                    :
                                                    :
                    Defendant.                       :
                                                    :
                                                    :
                                                    :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

The Government respectfully submits this memorandum of law in support of its opposition to the defendant's motion to suppress physical evidence and the defendant's post-arrest written statement.  The Court held a hearing on the defendant's motion over the course of three days:  June 6, 2006, July 5, 2006, and August 23, 2006.  For the reasons set forth below, the defendant's motion should be denied.  Neither the defendant's affirmation nor any of the witness testimony calls into question the mutually consistent testimony of Officer White and Sergeant Kivlehan that they observed an open glassine of heroin in the recess of the driver's door handle of the car the defendant was driving.  Based upon their observation of the open glassine, the officers had probable cause to arrest the defendant.  Likewise, the defendant's motion with respect to the suppression of his written statement should be denied.  The testimony of Officer White, Sergeant Kivlehan, Lieutenant McMahon, and the defendant established that,

2

immediately after his arrest, the defendant was concerned about his girlfriend and their child and told the officers that the gun recovered from the car and the drugs recovered from the defendant himself belonged to him.  The evidence also showed that (1) the defendant was advised of his Miranda rights before he was interviewed, (2) he thereafter agreed to waive those rights and provide a written statement, and (3) the written statement was not the result of threats or coercion.  Accordingly, the defendant's waiver of his Miranda rights was voluntary, knowing, and intelligent.  The Court thus should deny the defendant's motion to suppress the written statement.

**THE EVIDENCE AT THE HEARING**

The Government called three witnesses:  Officer Joseph White, Sergeant William Kivlehan, and Lieutenant Paul McMahon of the New York City Police Department.  The defense called two witnesses:  the defendant, as well as Yvonne Lavayen, the defendant's girlfriend, who was with the defendant on the night of the arrest.

    A.     **The Testimony of the Police Officers**

        1.     The Information From The Confidential Informant

The testimony of Lieutenant McMahon established the following:  In October 2005, a confidential informant (the "CI") informed him that an individual named "Vito" occasionally comes to the Bronx and often carries a gun.  Transcript of Suppression Hearing, August 23, 2006 ("Tr. III") at 74.  A few weeks later, the CI contacted Lieutenant McMahon and told him that "Vito" was in the vicinity of 183rd Street and the Grand Concourse in the Bronx.  Tr. III at 75; 110-111.  The CI also stated that "Vito" was a light-skinned man in his thirties with a bald or shaved head, he was in a black or dark green Honda or Acura, he was armed with a gun, and he

3

was there to buy drugs.  Tr. III at 75-77; 110-111.  After this conversation, Lieutenant McMahon

testified, he shared at least some of this information with Sergeant Kivlehan.  Tr. III at 122.

A few days later, on November 6, 2005, Lieutenant McMahon spoke to the CI about

"Vito" again.  Tr. III at 76.  In this conversation, the CI told Lieutenant McMahon that "Vito"

was again in the vicinity of the Grand Concourse, he was again armed with a gun, he was with a

female and a small child, and he was there to buy drugs.  Tr. III at 76.  After speaking with the

CI, Lieutenant McMahon called Sergeant Kivlehan because Sergeant Kivlehan was on patrol at

that time.  Tr. III at 77.  During that conversation, Lieutenant McMahon told Sergeant Kivlehan

that "Vito" was in the vicinity of the Grand Concourse armed with a gun and looking for drugs

in a black or green Honda or Acura with a woman and a child.[1]  Tr. III at 125.

2..    The Arrest

The testimony of Officer White and Sergeant Kivlehan established the following:  On the

evening of November 6, 2005, Officer White, Sergeant Kivlehan, and Officer Matthew

Carpenter were on patrol in the 46th Precinct in the Bronx.  Transcript of Suppression Hearing,

June 6, 2006 ("Tr. I") at 13-14; Tr. III at 4-5.  The officers were on patrol in an unmarked police

car, and were in uniform.  Tr. I at 13; Tr. III at 4.  Sergeant Kivlehan was driving the car, Officer

White was in the front passenger seat, and Officer Carpenter was in the back seat.  Tr. I at 13-14;

Tr. III at 4-5.  At approximately 6:00 p.m., Sergeant Kivlehan received a phone call from

Lieutenant McMahon.  During the call, Lieutenant McMahon relayed the information he had

received about "Vito" from the CI to Sergeant Kivlehan.  Tr. III at 5.  In November 2005,

---

[1]    Sergeant Kivlehan testified that he received similar information from Lieutenant
McMahon though he did not recall if Lieutenant McMahon told him that the individual's name
was "Vito."  Tr. III at 5, 24.

Sergeant Kivlehan testified, he was receiving information on a regular basis from at least a dozen other confidential informants, and this information included car descriptions as well as physical descriptions of individuals suspected of drug and gun possession.  Tr. III at 72.

After speaking with Lieutenant McMahon, Sergeant Kivlehan testified that he shared the information, at least in a general sense, with Officers White and Carpenter, and the three of them drove to 183rd Street and the Grand Concourse.[2]  Tr. III at 6-7.  When the officers did not observe anything suspicious at that location, they continued to patrol in the area.  Tr. III at 7.  Approximately a half hour later, they saw a dark colored car ahead of them on Valentine Avenue being driven erratically.  Tr. I at 14; Tr. III at 7.  The car was proceeding slowly, pulled off to the side of the street several times as if it was going to stop, and then pulled back into the street.  Tr. I at 14; Tr. III at 7.  The officers were not able to see into the car to determine who was driving and whether there were any passengers.  Tr. III at 55-56.  After a few blocks, the car came to a stop at the corner of Valentine Avenue and 180th Street, and double-parked in front of a fire hydrant.  Tr. I at 14; Tr. III at 7.  At this point, the officers pulled up next to the car, and Sergeant Kivlehan began speaking to the defendant, who was sitting in the driver's seat, from inside the police car through the open windows of the two cars.  Sergeant Kivlehan asked the defendant general questions about himself and the car.  Tr. I at 15; Tr. III at 8-9.  The defendant appeared to be very nervous when answering the questions and his responses were not consistent.  Tr. I at 15; Tr. III at 9.

The three officers then got out of their car, and Officer White stood at the driver's door of

---

[2]      Officer White testified that he recalled overhearing "something about a black car" that day but he did not have a memory of learning any of the other information provided by the CI.  Tr. II at 18.

the defendant's car, Sergeant Kivlehan proceeded to the front portion of the car also on the

driver's side, and Officer Carpenter walked around to the opposite side of the car.  Tr. I at 16; Tr.

III at 10.  Officer White, standing at the driver's door, then asked the defendant for his license

and registration.  Tr. I at 16.  The officers noticed that there were two passengers in the car, a

woman sitting in the front passenger seat and a child sitting in the back seat.[3]     Tr. I at 16-17;

Tr. III at 9-10.  While the defendant was looking for his license and registration, Officer White

shined his flashlight into the area of the car within the defendant's reach to make sure he was not

searching for a weapon.  Tr. I at 17.  While doing this, Officer White noticed an open glassine

envelope in the recess of the driver's door handle.  Tr. I at 17, 43-45.  Prior to this arrest, Officer

White had participated in at least twenty other arrests during which glassines of heroin were

recovered.  Tr. I at 73.  Based upon his experience, he believed that the open glassine he saw in

the recess of the driver's door handle contained heroin.  Tr. I at 17.

After Officer White saw the open glassine of heroin, he informed Sergeant Kivlehan and

Officer Carpenter, and the defendant was then placed under arrest.[4]     Tr. I at 18; Tr. III at 10-11.

The defendant was then searched and additional glassines of heroin were recovered from him.

Tr. I at 18; Tr. III at 11; Government Exhibit ("Gov. Ex.) 1.  The defendant was then placed in

the rear of a marked police car that had arrived at the scene.  Tr. I at 20.  Officer White then sat

in the front seat of the marked police car to check the defendant's license and registration.  Tr. I

---

[3]     According to Sergeant Kivlehan, it was after seeing the passengers in the car that
he first realized that the driver may be the individual described by the CI.  Tr. III at 9.

[4]     According to Sergeant Kivlehan, after Officer White informed him that he had
found the open glassine of heroin, Sergeant Kivlehan shined his flashlight on the driver's door
handle and also observed the open glassine in the recessed area.  Tr. III at 10.

6

at 20.  At this time, the defendant asked Officer White what was going to happen to his girlfriend

and his child.  Tr. I at 20.  Without being questioned, the defendant then told Officer White that

he had money in the car and that he may also have something in the car to protect the money.

Tr. I at 21.  Officer White then informed Sergeant Kivlehan that there may be money and a

weapon in the car.  Tr. III at 11.  Sergeant Kivlehan then asked the two passengers to get out of

the car, and he called Lieutenant McMahon to tell him that they may have arrested the individual

he had previously described.  Tr. III at 12.

> 3.      The Search of the Car

The testimony of all three officers established the following:  Lieutenant McMahon

arrived at the scene shortly after Sergeant Kivlehan called him.  Tr. III at 12, 78.  When the

Lieutenant arrived, Sergeant Kivlehan and Officer White updated him on what had occurred.  Tr.

III at 12, 79.  Lieutenant McMahon then spoke with the defendant, and the defendant again

expressed concern for his girlfriend and child.  Tr. III at 79.  Lieutenant McMahon then asked

the defendant about the weapon in the car that he had mentioned earlier, and the defendant

admitted that he had a gun in a bag in the backseat area of the car.  Tr. III at 12, 80.  Lieutenant

McMahon then searched the backseat area of the car and recovered $19,000 in cash and a loaded

nine millimeter gun.  Tr. I at 22; Tr. III at 12, 80.  After the gun and the cash were found, the

defendant again expressed concern about his girlfriend and child, and indicated that his girlfriend

had nothing to do with the items recovered.  Tr. III at 13, 80-81.  The defendant, his girlfriend,

and his child were then driven to the 46th Precinct station house.  Tr. I at 22; Tr. III at 12, 81.

> 4.      The Written Statement

The testimony of all three officers established the following: Once back at the station house, the defendant was processed and placed in a holding cell while his girlfriend and his child were placed in the juvenile room. Tr. I at 23. Thereafter, the defendant was brought to an office on the second floor of the station house and spoke with Lieutenant McMahon. Tr. I at 24; Transcript of Suppression Hearing, July 5, 2006 ("Tr. II") at 13; Tr. III at 81-82. During this initial conversation with Lieutenant McMahon, the defendant continued to express concern about his girlfriend and his child, he indicated that he wanted to give a statement, and he asked that his girlfriend and his child be released because the gun belonged to him. Tr. II at 13-14, 33; Tr. III at 82. In response, Lieutenant McMahon told the defendant, among other things, that he had to be advised of his <u>Miranda</u> rights before any statement could be taken, and that even if he claimed responsibility for the gun, his girlfriend may not be released.[5]    Tr. III at 82-83. Lieutenant McMahon did not advise the defendant of his <u>Miranda</u> rights at this time because he did not ask him any questions about the drugs and the gun recovered that night. Tr. III at 82-83. Lieutenant McMahon then left the office to speak with the defendant's girlfriend and to confirm that she was not involved as the defendant claimed. Tr. III at 83.

After speaking with the defendant's girlfriend, Lieutenant McMahon returned to the office and interviewed the defendant along with Sergeant Kivlehan and Officer White. Tr. I at 25; Tr. III at 84-85. At the beginning of the interview, the defendant was advised of each of his <u>Miranda</u> rights through the use of a standard written form. Tr. I at 25; Tr. III at 13, 84; Gov. Ex. 2. Each question was read to him from the form and he then answered the question and initialed

---

[5]    According to Officer White, during this initial encounter at the station house, Lieutenant McMahon also advised the defendant that he did not have to talk to him and that any statements he made could be used against him. Tr. II at 14, 33.

next to his answer indicating that he waived each of his <u>Miranda</u> rights.  Tr. I at 25; Tr. III at 84-

85.  The defendant then signed the form in the middle of the page below his answers.  Tr. I at 26;

Gov. Ex. 2.

The officers then interviewed the defendant about the gun and the drugs recovered, and

the defendant admitted that the gun and the drugs belonged to him.  Tr. III at 13, 85-86.  The

defendant then provided a written statement on the <u>Miranda</u> form in which he claimed

responsibility for the gun and the drugs, as well as some of the cash that was found.  Tr. I at 25-

26; Tr. III at 86; Gov. Ex. 2.  At the bottom of the statement, the defendant again signed the

form.  Tr. I at 26; Gov. Ex. 2.  The defendant continued to be cooperative while he made the

written statement and was not threatened.  Tr. I at 25.  In fact, as all three officers testified, at no

point from the time the officers pulled up next to the defendant in their car until he provided the

written statement was the defendant threatened in any manner.  See Tr. I at 25, 27; Tr. III at 13-

14, 87.

B.     **The Testimony of the Defendant**

The defendant testified that he began using heroin and cocaine approximately one year

before he was arrested.  Tr. I at 78.  On the day of his arrest, he used heroin and cocaine just

before he began driving his girlfriend, Yvonne Levayan, and their child from Staten Island to the

Bronx. Tr. I at 129.  He acknowledged that he tested positive for both heroin and cocaine after

his arrest.  Tr. I at 128.  He testified that he usually went through six or seven bags of heroin per

day.  Tr. I at 81.  According to the defendant, he sniffed heroin and never injected it, and he

would typically buy it in bundles of ten bags.  Tr. I at 79-80, 130.  The defendant testified that he

had never once sniffed heroin in a car over the course of his year-long addiction.  Tr. I at 130.

9

The defendant stated that he was driving his girlfriend and their child to the Bronx so that he could drop them off at his girlfriend's mother's house. Tr. I at 91. The drive took several hours because of traffic, and he and his girlfriend spent much of it arguing about the future of their relationship. Tr. I at 129. Once they reached the Bronx, he stopped on the Grand Concourse and bought forty bags of heroin for $200 from "Kenny," an individual he had bought drugs from in the past. Tr. I at 91-92, 142. The defendant testified that, after buying the forty bags, he put all of them in his buttocks because he did not want the police to be able to find them. Tr. I at 96-97. Once he was back in the car, the defendant stated that he noticed an unmarked police car following him while he was driving on the Grand Concourse. Tr. I at 98. According to the defendant, the unmarked police car followed five feet behind him for three or four blocks until he stopped at a store on 180th Street and Valentine Avenue. Tr. I at 101.

The defendant testified that the unmarked police car then pulled up next to his car and the officer in the front passenger seat began talking to him. Tr. I at 109. The defendant described that officer as a white man who was about forty years with red hair. Tr. I at 109. That officer began questioning the defendant about the tinted windows in his car, and then he and the officer who was driving got out of their car and approached the defendant's car. Tr. I at 110-11. According to the defendant, neither of these officers was Officer White. Tr. I at 107, 111. The defendant testified that the first time he saw Officer White was when he was put into a police car after his arrest. Tr. I at 108, 137. The defendant stated that the red haired officer stood at the driver's window and asked him for his license and registration. Tr. I at 112. According to the

defendant, there were no drugs in the recess of the driver's door handle.[6]    Tr. I at 106.  After the defendant handed over his license and registration, the defendant stated, the red haired officer opened the door, "pulled" the defendant out of the car and started to search him immediately. Tr. I at 113.  The defendant testified that the officer also asked him about drugs.  Tr. I at 114. According to the defendant, the officer then brought the defendant to the rear of the car and searched him again before he handcuffed him and "threw" him in the car.  Tr. I at 115.  At this time, the defendant stated, he was nervous and concerned not only for himself but also for his girlfriend and his child.  Tr. I at 150.  He also testified that, at this time, he made it clear to the officers that the gun and the drugs belonged to him.  Tr. I at 150.

After the defendant was placed in the police car, he was brought back to the police station.  Tr. I at 118.  At the station, the defendant testified, he expressed his concern for his girlfriend to the red haired officer.  Tr. I at 153.  He also stated that he told the officers that he had been taking drugs for a year and asked them not to tell his girlfriend.  Tr. I at 119.  The defendant was then taken to an interview room and asked about the gun and the drugs.  Tr. I at 153-54.  He stated that he was cooperative with the officers and told them that both the gun and the drugs belonged to him.  Tr. I at 154-55.  The defendant also testified that he was not advised of his <u>Miranda</u> rights on the way to the station house or before he was interviewed.  Tr. I at 156. Officer White, the red-haired officer and other officers told him that, if he did not sign a written statement claiming responsibility for everything in the car, his girlfriend and his child would not be released.  Tr. I at 122-25.  According to the defendant, at some point, he was taken to see his

---

[6]    In his affirmation, the defendant states that there were no drugs "in the door console nor anywhere visible in my car."  Affirmation of Vito Forestier dated March 20, 2006 ("Forestier Aff.") at ¶ 4.

girlfriend and his child, and he then signed a written statement. Tr. I at 125.

According to the defendant's testimony, his memory of writing the written statement is unclear because he was on drugs at the time.  Tr. I at 157-58.  When shown Government Exhibit 2, his written statement, he stated that "there is things missing that I remember writing."  Tr. I at 158.  He testified that he was not read any of the six <u>Miranda</u>-related questions on the top of Government Exhibit 2 but that he did write his initials and the word "Yes" after each question. Tr. I at 159.  The defendant also testified that he wrote only some of the written statement, and some of the handwriting that appeared in the written statement was not his.  Tr. I at 159-62. Specifically, he stated that he did not recall writing the second sentence of the written statement, "the gun and drugs was mine."  Tr. I at 160.  He also testified that, even though it does not appear in the statement, he wrote his girlfriend's full name in the fourth sentence, which concerned the cash that was recovered.  Tr. I at 161.  With respect to the same sentence, which contains one set of the initials "VF" next to a crossed-out "15" and a second set next to a crossed-out "5," the defendant stated that he wrote the initials next to the "15" but not the initials next to the "5."  Tr. I at 161-62.

**C.**    **The Testimony of Defense Witness Yvonne Levayan**

Defense witness Yvonne Levayan testified that she has known the defendant for nine years and described him as her "husband without a ring." Tr. I at 172.  They have a young child together and they had been living together in Staten Island at the time of the arrest in November 2005.  Tr. I at 172-73.  However, Levayan testified that she did not know the defendant was a drug addict until after he was arrested, and it would have surprised her if the defendant had used drugs before he drove her and her daughter to the Bronx on the day of the arrest.  Tr. I at 174,

12

202.  Levayan testified that she did not know that the defendant kept a gun with the cash that was

recovered.  Tr. I at 205.  She also stated that, though the defendant had been unemployed for a

year prior to the arrest, he always had money and was able to buy a new car and help pay

monthly bills.  Tr. I at 211-12.

On the day of the arrest, Levayan and the defendant discussed the possibility of

separating while they were driving with their child from Staten Island to the Bronx.  Tr. I at 174.

Levayan testified that they planned to separate because they had been arguing constantly and

"there wasn't enough trust in the relationship."  Tr. I at 202.  Their drive from Staten Island took

several hours because of New York City Marathon related traffic.  Tr. I at 173.  During those

hours, Levayan testified that she did not suspect that the defendant was on drugs.  Tr. III at 213.

Prior to being approached by the police in the Bronx, Levayan testified that they stopped

on the Grand Concourse, and the defendant went into a store and returned with a bottle of soda.

Tr. I at 179.  They then made a second stop at 180th Street and Valentine Avenue because their

daughter was upset and wanted something to eat.  Tr. I at 180.  After they stopped, according to

Levayan, a black car with four police officers in it pulled up next to their car.  Tr. I at 181, 186.

Officer White was sitting in the front passenger seat and "the sergeant" was driving the car.  Tr. I

at 182.  Levayan testified that the officers began speaking to them from their car, and then the

sergeant got out of the car and asked the defendant for his license and registration.  Tr. I at 181-

83.  Levayan described the sergeant as a Caucasian man in his thirties with reddish hair.  Tr. I at

183-84.

After the defendant handed the sergeant his license and registration, Levayan testified

that the sergeant told the defendant to get out of the car.  Tr. I at 186.  The defendant was then

13

taken to the rear of the car and his hands were placed up against the trunk of the car. Tr. I at 186. At this time, the other police officers had surrounded the car, and according to Levayan, a Hispanic officer shined a flashlight into the car and said that he was trying to see something inside the car. Tr. I at 187. At this time, Levayan stated that she heard the defendant say "whoa, whoa" and "you're making me uncomfortable," and she heard the sergeant say, "Why are you so nervous?" and "If we can't do it here, then we will do it at the precinct." Tr. I at 187. The sergeant then put the defendant in a police car, Levayan testified, and then asked her where the drugs were and said he was going to take her daughter to "BCW." Tr. I at 188.

Thereafter, according to Levayan, she was taken to the station house along with the defendant and their daughter. Tr. I at 190. Once at the station house, she was interviewed by Officer White and other officers. Tr. I at 192. Levayan testified that she had conversations with Officer White and other officers at the station house in which she was told that she and her daughter may not be released unless the defendant provided a written statement in which he accepted responsibility for the gun and everything else that was in the car. Tr. I at 192-93. After these conversations, she stated, the defendant was brought into the room with her and her daughter, and she talked to the defendant about what he should do. Tr. I at 193. At this time, Levayan testified that the officers told the defendant what to write and the order in which to write it. Tr. I at 194. The defendant then wrote out the statement and signed it in Levayan's presence. Tr. I at 194. Levayan testified that later that evening her daughter was released to Levayan's sister, and Levayan herself was released the next morning. Tr. I at 190.

**ARGUMENT**

### A.   THE TESTIMONY OF OFFICER WHITE, SERGEANT KIVLEHAN AND LIEUTENANT MCMAHON WAS CREDIBLE AND CONSISTENT

The testimony of Officer White and Sergeant Kivlehan concerning the approach and the arrest of the defendant was consistent on all major points throughout both direct and cross-examination.  Moreover, their testimony on this subject was corroborated by the testimony of Lieutenant McMahon and Government Exhibit 1, which included the single open glassine of heroin recovered from the driver's door handle.  Furthermore, the testimony of all three officers was similarly consistent with respect to the written statement provided by the defendant and that testimony is corroborated by Government Exhibit 2, the defendant's written <u>Miranda</u> waiver and written statement.

Sergeant Kivlehan and Lieutenant McMahon both testified that they spoke on the telephone shortly before the defendant's arrest on the evening of November 6, 2005.  During that call, both officers testified that Lieutenant McMahon relayed to Sergeant Kivlehan the information that he had received from the CI earlier that day.  Tr. III at 5, 77.  While Sergeant Kivlehan did not specifically recall whether the Lieutenant provided him with the name "Vito," Tr. III at 24, the testimony of both officers was entirely consistent with respect to the other information provided by the CI:  (1) he was a light-skinned male; (2) he was presently in the vicinity of 183rd Street and the Grand Concourse; (3) he may have a gun; (4) he was in the Bronx to purchase drugs; (5) he was in a dark colored car; and (6) he was driving with a woman and a child.  Tr. III at 5-6, 24-26, 75-77, 110-111.  Thereafter, Sergeant Kivlehan testified that he shared this information, at least in a general sense, with Officers White and Carpenter.  Tr. III at 6-7.  Although Officer White did not recall receiving this type of specific information from

15

Sergeant Kivlehan, he testified that he had a memory of learning some information about a black car around this time. Tr. II at 18.

Furthermore, the testimony of Sergeant Kivlehan and Officer White concerning the approach of the defendant's car was similarly consistent. Both officers testified that the following occurred: (1) they were on patrol in an unmarked car with Officer Carpenter driving on Valentine Avenue, Tr. I at 14, Tr. III at 7; (2) they observed a car ahead of them being driven erratically as the car was pulling over toward the curb and then turning back into traffic, Tr. I at 14, Tr. III at 7; (3) the car eventually came to a stop at the corner of 180th Street and Valentine Avenue, and double-parked in front of a fire hydrant, Tr. I at 14, Tr. III at 7; (4) the officers then pulled up next to the car, and Sergeant Kivlehan began speaking to the defendant, who was sitting in the driver's seat, from inside the police car, Tr. I at 15, Tr. III at 8-9; (5) the defendant appeared to be very nervous talking to Sergeant Kivlehan and his responses were not consistent, Tr. I at 15, Tr. III at 9; (6) and, as a result, the officers got out of their car, with Officer White standing at the driver's door of the defendant's car, Sergeant Kivlehan walking to the front area of the defendant's car on the driver's side, and Officer Carpenter going around to the passenger side of the defendant's car, Tr. I at 16; Tr. III at 10. Moreover, both officers stated that they first observed the defendant's car while on Valentine Avenue and did not begin following him on another street. Tr. I at 70; Tr. III at 43.

Just as their testimony regarding the approach of the defendant was in agreement, the testimony of Sergeant Kivlehan and Officer White was consistent on all major points with respect to the arrest of the defendant. Both officers testified that the following occurred: (1) while standing at the driver's door, Officer White saw an open glassine in the recess of the

16

driver's door handle, Tr. I at 17, Tr. III at 10; (2) the defendant was then taken to the rear of his

car and placed under arrest, Tr. I at 18, Tr. III at 10-11; and (3) the defendant was searched and

additional glassines of heroin were recovered, Tr. I at 18; Tr. III at 11. This testimony is

corroborated by Government Exhibit 1, the narcotics envelope containing the single open

glassine of heroin recovered from the driver's door handle and the forty closed glassines

recovered from the defendant. The single open glassine was vouchered as a separate item from

the forty closed glassines, which supports the officers' testimony that they were found in

separate locations. Thereafter, according to the testimony of both Sergeant Kivlehan and Officer

White, the defendant told Officer White that he had money and possibly a weapon in the car. Tr.

I at 21; Tr. III at 11. Both Sergeant Kivlehan and Lieutenant McMahon testified that Sergeant

Kivlehan then called Lieutenant McMahon and told him that they may have arrested the

individual Lieutenant McMahon had previously described. Tr. III at 12, 78.

The testimony of all three officers was similarly consistent in describing the period from

when Lieutenant McMahon arrived to the scene of the arrest until the defendant provided a

written statement. All three officers testified that (1) the defendant expressed concern for his

girlfriend and his daughter at the scene shortly after being arrested, Tr. I at 21, Tr. III at 64, 71,

79; (2) the defendant admitted at the scene that he had a gun in the backseat area of the car, Tr. I

at 21, Tr. III at 12, 80;[7] (3) Lieutenant McMahon searched the backseat area of the car and

recovered cash and a gun, Tr. I at 22, Tr. III at 12, 80; and (4) the defendant, his girlfriend and

his child were then driven to the 46th Precinct station house, Tr. I at 22, Tr. III at 12, 81.

---

[7]     Officer White testified that the defendant told him that he may have brought
something out to protect his money but did not use the word "gun." Tr. I at 21.

17

At the station house, again according to the testimony of all three officers, the defendant was processed and then brought to an office on the second floor of the station house. Tr. I at 24; Tr. II at 13; Tr. III at 81-82. Both Lieutenant McMahon and Officer White testified that, at this time, Lieutenant McMahon had an initial conversation with the defendant about whether the defendant wanted to provide a statement to the police.[8]    Tr. II at 13-14, 33; Tr. III at 82. The defendant indicated that he wanted to provide a statement during this initial conversation but Lieutenant McMahon did not interview the defendant or attempt to elicit any statement at this time. Tr. II at 13-14, 33; Tr. III at 82. As Lieutenant McMahon testified, before interviewing the defendant, he wanted to speak with his girlfriend to determine if she had any knowledge or involvement with the gun and the drugs recovered from the car. Tr. III at 83.

Thereafter, all three officers testified consistently they were present for the interview of the defendant, which occurred in an office on the second floor of the station house. Tr. I at 25; Tr. III at 13, 84-85. At the beginning of the interview, according to all three officers, the defendant was advised of his Miranda rights through the use of a standard written form, and the defendant then waived each of his Miranda rights by writing the word "Yes" and his initials on the form and signing the form. Tr. I at 25-26; Tr. III at 13, 84-85; Gov. Ex. 2. Thereafter, again according to all three officers, the defendant, as he had said at the scene, admitted that the gun and the drugs recovered from the car belonged to him and he then provided a written statement to that effect. Tr. I at 25-26; Tr. III at 13, 85-86. Finally, all three officers stated that the defendant provided the written statement voluntarily and was not threatened or coerced in any manner at this time or at any other time. Tr. I at 25, 27; Tr. III at 13-14, 87.

---

[8]    Sergeant Kivlehan was not questioned about this initial conversation.

18

In sum, the testimony of each of the three police witnesses was credible and both internally consistent throughout direct and cross-examination and consistent with one another. As set forth below, the evidence established through the police witnesses at the hearing conclusively demonstrates that the police officers' arrest of the defendant was supported by probable cause, and the defendant's post-arrest, post-<u>Mirandized</u> written statement was voluntary.

### B.    THE TESTIMONY OF THE DEFENDANT WAS NOT CREDIBLE ON ITS FACE AND SHOULD BE REJECTED BY THE COURT

The testimony of the defendant with respect to the events surrounding his arrest and his written statement was internally inconsistent, at odds with clearly established facts and the evidence, and contradicted by the testimony of the only other defense witness. Therefore, the defendant's testimony regarding his arrest and his written statement was clearly incredible on its face and should not be considered by the Court in its determination of this motion.

On the stand, the defendant admitted that he had been using both heroin and cocaine throughout the year leading up to his arrest. Tr. I at 78. Moreover, on the day of his arrest, he had sniffed three bags of heroin and used cocaine just before getting into the car with his girlfriend and child and driving them from Staten Island to the Bronx. Tr. I at 129. Indeed, the defendant tested positive for both heroin and cocaine following his arrest. Tr. I at 128. Thus, the defendant was high on both heroin and cocaine throughout the period when he was behind the wheel of the car, including when he was approached and ultimately arrested by the officers. However, the defendant, when asked by the Court, stated that he had a clear memory of everything that happened between when he left Staten Island and when he provided his written statement. Tr. I at 158. Yet, with respect to providing the written statement in which he

admitted that the gun and the drugs recovered belonged to him, the defendant explained, "I don't remember – I was on drugs."  Tr. I at 157.

Notwithstanding the defendant's assurance to the Court that he had a clear memory of all of the events leading up to his written statement, including his arrest, his testimony makes it apparent that his recall of the circumstances surrounding his arrest was also impaired.  For example, the defendant testified that Officer White was <u>not</u> one of the officers who initially approached him or arrested him.  Tr. I at 107, 111.  Despite being given the opportunity by his counsel to clarify his testimony, the defendant was sure that he did not see Officer White until he was put into the back of a police car after his arrest.  Tr. I at 108, 137.  This testimony was simply wrong and was contradicted by the testimony of all of the other witnesses who testified at the hearing, including Ms. Levayan.  Tr. I at 182.  The defendant's inaccurate testimony about a fact as elemental as the identity of his arresting officer, even after the defendant had the opportunity to see Officer White testify and hear him recount the details of the arrest, provides an insight into the defendant's state of mind at the time of the arrest and certainly casts doubt on the entirety of his testimony.

The defendant's testimony concerning his arrest is further undermined by additional inaccuracies.  For example, the defendant testified that the officer who spoke to him prior to his arrest had red hair.[9]   Tr. I at 109, 112.  As the Court observed, both Sergeant Kivlehan and Officer White (as well as Lieutenant McMahon) have dark colored hair and Sergeant Kivlehan testified that he has not dyed his hair another color over the past year.  Tr. III at 14.  In addition,

---

[9]      Yvonne Levayan also testified that the Sergeant who spoke to the defendant had red hair.  Tr. I at 184.

the defendant testified that he was removed from the car and searched immediately by the red-haired officer, before he was searched again at the rear of the car.  Tr. I at 113.  Like the defendant's testimony about Officer White, this statement is at odds with the testimony of all the other witnesses who testified, again including Ms. Levayan.  Like the three officers, she testified that, after the defendant was out of the car, he was taken to the rear of the car and then searched.  Tr. I at 186.  Thus, it is clear that the defendant's testimony about the details of his arrest, both major and minor, was inaccurate and unsupported by any other testimony or evidence.

These significant inaccuracies, however, are hardly surprising given the defendant's condition at the time the officers approached:  (1) he was high on heroin and cocaine; (2) he had just purchased forty glassines of heroin only a few minutes earlier; (3) he had stored the forty glassines in his buttocks; (4) he knew that he had a gun and a significant amount of cash in the car; (5) he had just spent several hours driving his girlfriend and their child from Staten Island to the Bronx because they were no longer going to be living with him; (6) during the drive, he and his girlfriend continued to argue about whether they should separate; and (7) when the police approached, both his girlfriend and their child became very upset.  Thus, the defendant was not only affected by the heroin and the cocaine in his system at the time of the arrest, he was also under considerable stress, all of which no doubt impaired his ability to process what was going on around him.  Accordingly, the defendant's inaccurate testimony regarding other important facts reveals that his claim in his affirmation and on the stand that there was no glassine in the recess of the driver's door handle is also baseless.

To the extent the defendant retained any credibility after his testimony concerning the arrest, it was completely undermined by his testimony about his written statement.  According to

the defendant, he was concerned about his girlfriend and his daughter at the scene of the arrest and he made it clear to the officers at the scene that the gun and the drugs belonged to him.  Tr. I at 150.  He also stated that, once at the station house, he expressed his concern for his girlfriend to one of the officers and was "cooperative" with the officers, telling them again that the gun and the drugs were his.  Tr. I at 154-55.  Yet, despite the defendant's cooperative attitude and despite the fact that he had admitted that the gun and the drugs were his both at the scene and at the station house, he testified that the officers found it necessary to threaten him so that he would provide a written statement claiming responsibility for the gun and the drugs.  Tr. I at 120-24. Moreover, while the defendant clearly recalled that he was never advised of his <u>Miranda</u> rights,[10] Tr. I at 156, he stated that he wrote his initials and the word "Yes" after each <u>Miranda</u> question on Government Exhibit 2, as well as the signature in the middle of page, Tr. I at 157, 159.  In addition, as noted above, the defendant testified that, even though he signed his signature at the bottom as well, he wrote only some of the written statement contained in the bottom half of Government Exhibit 2 and was not sure that all the handwriting was his.  Tr. I at 159-62. Tellingly, the only sentence that the defendant stated he did not recall writing was the second sentence, which reads "the gun and drugs was mine."  Tr. I at 160-62.  Thus, the defendant's testimony concerning his written statement is rife with even more inconsistencies than his testimony about his arrest.  Like his arrest-related testimony, his testimony about post-arrest events, and his claim that he was threatened by the police, flies in the face of his own testimony

---

[10]     It should be noted that the defendant made no <u>Miranda</u>-related claim in his affirmation.  Certainly if the defendant had stated from the outset that he was never advised of his <u>Miranda</u> rights prior to making his written statement, his experienced counsel would have noted that in the affirmation.

(and the testimony of all three officers) that he was cooperative with the police and almost immediately acknowledged that the gun and the drugs were his. Indeed, it simply makes sense that the defendant was cooperative and eager to acknowledge his guilt because he wanted to ensure that his girlfriend and his child were released as promptly as possible. Accordingly, the defendant's testimony concerning his written statement is not credible on its face, and the claim that his written statement was the product of threats or coercion should be denied.

### C. DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE SHOULD BE DENIED BECAUSE THE RECORD DEMONSTRATES THAT THE OFFICERS HAD PROBABLE CAUSE TO ARREST HIM

The defendant's motion to suppress the physical evidence that the police recovered from him on November 6, 2005, should be denied. The testimony of Officer White and Sergeant Kivlehan clearly established that Officer White saw an open glassine of heroin in the recess of the driver's door handle of the car that the defendant was driving. That fact provided probable cause for the officers to arrest the defendant for drug possession.[11]

### 1. Applicable Law

"[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." United States v. Fisher, 702 F.2d 372, 375 (2d Cir. 1983); accord United States v. Ceballos, 812 F.2d 42, 50 (2d Cir. 1987). To establish probable cause,

---

[11]     It is undisputed that the defendant came to a stop on his own in front of a fire hydrant on the corner of 180th Street and Valentine Avenue. The officers did not direct the defendant to pull over or come to a stop, and the officers approached the defendant's car only after he came to a stop in front of the fire hydrant. Thus, there is no basis to challenge the officers' approach of the defendant.

"it is not necessary to make a prima facie showing of criminal activity or to demonstrate that it is more probable than not that a crime has been or is being committed." United States v. Cruz, 834 F.2d 47, 50 (2d Cir. 1987) (quotation omitted).

Rather, probable cause merely requires a "fair probability" under the "totality of the circumstances" that the defendant to be arrested has committed a crime. Illinois v. Gates, 462 U.S. 213, 238 (1983). It "is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Maryland v. Pringle, 124 S. Ct. 795, 799 ( 2003) (quotations omitted).

2.      Discussion

Based on the foregoing, it is clear from the evidence in the record that the officers had probable cause to arrest the defendant. It is a crime under both New York State law and Federal law to possess narcotics. See New York State Penal Law, Article 220; United States Code, Title 21. The testimony of Officer White and Sergeant Kivlehan established that, while on patrol around 7:00 p.m. on November 6, 2005, they observed the defendant driving erratically before he came to a stop at the corner of 180th Street and Valentine Avenue. Tr. I at 14; Tr. III at 7. The officers then pulled up next to the defendant's car, and, after the defendant rolled down the window of his car, Sergeant Kivlehan began speaking with him from inside his car. Tr. I at 15; Tr. III at 8-9. According to both Sergeant Kivlehan and Officer White, the defendant appeared to be very nervous and his responses to Sergeant Kivlehan's questions were inconsistent. Tr. I at 15; Tr. III at 9. As a result, the officers got out of their car, and Officer White stood at the driver's door with the window down, Sergeant Kivlehan stood near him at the front portion of the driver's side of the defendant's car, and Officer Carpenter walked around to the passenger

24

side of the defendant's car.  Tr. I at 16; Tr. III at 10.  Officer White then asked the defendant for

his license and registration.  Tr. I at 16.  While the defendant was looking for his license and

registration, Officer White shined his flashlight into the area of the car within the defendant's

reach to make sure he was not retrieving a weapon.  Tr. I at 17.  While doing this, Officer White

saw "folded-up wax paper" with red-ink on it right below him in the recess of the driver's door

handle.  Tr. I at 17, 43-45.  Based on his experience, which included at least twenty other arrests

during which glassines of heroin were recovered, and the appearance of the wax paper in the

door handle, Officer White believed that it was an open glassine envelope that contained heroin.

Tr. I at 17, 73.  This was the same open glassine envelope that Sergeant Kivlehan also observed

in the door handle recess after White signaled him, Tr. III at 10, and the same opened glassine

envelope that Officer White vouchered as a separate item in Government Exhibit 1.  At this

point, Officer White had probable cause to believe that the glassine contained narcotics and that

the glassine belonged to the defendant or to his adult passenger.  Accordingly, the officers had

probable cause to arrest the defendant for a violation of state and federal narcotics possession

laws.

  The only testimony elicited at the suppression hearing that challenges the mutually

consistent testimony of Officer White and Sergeant Kivlehan was that of the defendant, who

claimed that there were no drugs in the recess of the driver's door handle.  Tr. I at 106.  For the

reasons discussed in Part II, supra, that testimony was not credible and should not be considered.

To the extent that the defendant's testimony is considered, it should be noted that he testified to

the following:  (1) he only sniffs heroin and does not inject it, Tr. I at 79-80, 130; (2) he usually

sniffs six or seven bags of heroin per day, Tr. I at 81; (3) he sniffed three bags of heroin before

he got into the car on the day of his arrest, Tr. I at 144; (4) he was driving for approximately five hours and did not sniff while driving, Tr. I at 129-30; (5) in addition to the forty glassines that he put in his buttocks, he kept glassines in a cell phone case in the car with him, Tr. I at 89; and (6) his girlfriend did not know he used drugs, Tr. I at 119. This testimony certainly allows for the possibility that, at the time he was approached by the police, the defendant was in need of another hit of heroin, that he had placed the open glassine in the recess of the door handle so that his girlfriend would not see it, and that he planned to sniff it at the next available opportunity.

In addition, the only other defense witness, Ms. Lavayan, did not provide any testimony on whether there was an open glassine in the recess of the driver's door handle. She did not provide any testimony because, from her position in the front passenger seat, she could not have seen all the way into the recessed area of the driver's door handle. Thus, her testimony is of no relevance to this portion of the defendant's motion, namely, whether the officers saw a glassine of heroin in the driver's door handle and whether the officers had probable cause to arrest the defendant.

Finally, the testimony of Sergeant Kivlehan and Officer White demonstrated that the information received from the CI did not play any role in the decision to approach and arrest the defendant. As Sergeant Kivlehan testified, he was receiving information on a regular basis from at least 12 confidential informants at that time, and the information included vehicle descriptions as well as physical descriptions of individuals suspected of drug and gun possession. Tr. III at 72. He had much more on his mind other than "Vito." Moreover, while following the defendant's car on Valentine Avenue, the officers were not able to see into the car to determine who was driving or whether there were any passengers. Tr. III at 55-56. As Sergeant Kivlehan

explained on cross-examination, it was a coincidence that he began following "Vito," and if he had known it was "Vito" in the car, the "Vito" believed to be looking for drugs with a gun in his possession, he would not have pulled up right next to him the way he did.  Tr. III at 57.  If Sergeant Kivlehan knew the driver was "Vito," he certainly made himself and Officer White easy targets by pulling up alongside him and engaging him in a conversation.  Moreover, Sergeant Kivlehan did not deny making any connection between "Vito" and the defendant; he testified that he first realized that the defendant could be "Vito" after he had approached the defendant's car on foot and saw the two passengers in the car.  Tr. III at 9.

Similarly, it is clear that the information from the CI did not play any role in Officer White's decision to arrest the defendant.  Although Sergeant Kivlehan testified that he relayed at least some of the information about "Vito" to Officer White, Tr. III at 6-7, Officer White testified that he only recalled overhearing "something about a black car,"  Tr. II at 18.  Thus, as he was speaking with the defendant and shining his flashlight on his reachable area, Officer White did not think that the defendant was "Vito," and the only reason he placed the defendant under arrest was, as he testified, his discovery of the open glassine of heroin in the recess of the driver's door handle.  Accordingly, based upon the credible and consistent testimony of Officer White and Sergeant Kivlehan, which is corroborated by Government Exhibit 1, it is evident from the record that they had probable cause to arrest the defendant for the possession of narcotics.

### D.    DEFENDANT'S WRITTEN STATEMENT WAS MADE KNOWINGLY, VOLUNTARILY, AND INTELLIGENTLY, AND WAS NOT COERCED

The Court should also dismiss the defendant's motion to suppress his post-Miranda written statement.  The facts clearly demonstrate that the defendant was eager to provide a statement claiming responsibility for the gun and the drugs recovered from the car and that his

waiver of his Miranda rights was done knowingly, voluntarily and intelligently.

      1.      Applicable Law

In general, a defendant's statements made during custodial interrogation are not admissible against him for use in the Government's case-in-chief, unless the Government can prove that, prior to questioning, the defendant was "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda v. Arizona, 384 U.S. 436, 444 (1966). For the Government to introduce a defendant's incriminating statement, the Government must generally prove that the accused waived his Miranda rights voluntarily, knowingly, and intelligently. Id. at 475. In determining whether a Miranda waiver is valid, the Court is free to consider the "totality of the circumstances surrounding the interrogation." Moran v. Burbine, 475 U.S. 412, 421 (1986). A written waiver of rights is not required. United States v. Spencer, 955 F.2d 814, 819 (2d Cir. 1992). Nor is it necessary for a person to be aware of the consequences of being questioned for a waiver of Miranda rights to be knowing and intelligent. California v. Beheler, 463 U.S. 1121, 1125 n.3 (1983). The Government must prove waiver by a preponderance of the evidence. See Colorado v. Connelly, 479 U.S. 157, 168 (1986).

      2.      Discussion

The testimony of all three officers and Government Exhibit 2 establish that (1) the defendant was eager to provide a statement claiming responsibility for the gun and the drugs; (2) he was advised of his Miranda rights before he was interviewed at the station house; (3) he waived those rights; and (4) he subsequently provided a written statement. The defendant

nevertheless contends, both in his affirmation and in his testimony, that his waiver was not voluntary but the result of threats made by the police. Forestier Aff. at ¶ 5; Tr. I at 122-25. However, the mutually consistent description of the circumstances surrounding the interview provided by Lieutenant McMahon, Sergeant McMahon, and Officer White demonstrates that the defendant's waiver of his <u>Miranda</u> rights was done voluntarily, knowingly, and intelligently.

To begin, the testimony of all three officers established that the events leading up to the interview and the circumstances of the interview itself were in no way coercive. In fact, there was no reason at all for the officers to coerce or threaten the defendant because, as all three officers <u>and the defendant</u> testified, the defendant gave an oral confession at the scene to the officers. Moreover, he did so voluntarily and without being questioned by the officers. Tr. I at 21, 150; Tr. III at 21, 79. Thus, it is undisputed that the defendant began cooperating with officers almost immediately, before he had even reached the station house and was interviewed.

Once back at the station house, according to both Lieutenant McMahon and Officer White <u>and the defendant</u>, the defendant continued to be cooperative with the officers and expressed a desire to provide a statement. Tr. I at 154-55; Tr. II at 13-14, 33; Tr. III at 82. In an initial conversation with the defendant in an interview room on the second floor of the station house, the defendant expressed concern about his girlfriend and his child, and he asked that they be released because the gun belonged to him. Tr. II at 13-14, 33; Tr. III at 82. In response, Lieutenant McMahon testified that he told the defendant that he had to be advised of his <u>Miranda</u> rights before any statement could be taken from him, and that even if he claimed responsibility for the gun, his girlfriend may not be released. Tr. III at 82-83. In addition, according to Officer

White, Lieutenant McMahon also informed the defendant during this initial conversation that he did not have to provide any statements and that any statements he provided could be used against him. Tr. II at 14, 33. Lieutenant McMahon then left the interview room without asking the defendant any questions about the gun or the drugs in order to confirm that the girlfriend was not involved as the defendant claimed. Tr. III at 82-83.

Thereafter, Lieutenant McMahon returned to the second floor interview room, and along with Sergeant Kivlehan and Officer White, began to interview the defendant. Tr. I at 25; Tr. III at 84-85. After the defendant was advised of each of his <u>Miranda</u> rights, he waived each one by writing "Yes" and his initials "VF" and signing the form.[12]    Tr. I at 25; Tr. III at 84-85. The officers then asked the defendant about the gun and the drugs recovered, and, as both Officer White <u>and the defendant</u> testified, the defendant was "cooperative" with them. Tr. I at 25, 155. In particular, the defendant admitted that the gun and the drugs were his. Tr. III at 13, 85-86. The officers then asked the defendant to provide a written statement to that effect on the same form that he had signed and initialed to indicate his <u>Miranda</u> waiver. The defendant then provided the written statement and signed the form again at the bottom. Tr. I at 26. Finally, as the three officers testified, nobody ever threatened the defendant in any manner, which is consistent with their testimony and the defendant's testimony that he provided an oral confession shortly after his arrest and was cooperative back at the station house. Tr. I at 25, 27; Tr. III at 13-14, 87.

---

[12]    As noted earlier, the defendant testified that he was never advised of his <u>Miranda</u> rights, even though he wrote the word "Yes" and his initials on the form after each <u>Miranda</u> related question. Tr. I at 156. For the reasons discussed in Part B <u>supra</u>, that testimony should not be considered by the Court.

The only other testimony elicited at the hearing regarding the circumstances surrounding the defendant's written statement was provided by Ms. Levayan. However, her testimony did not support the defendant's claim that he was threatened. Instead, she stated that, at the station house, she, along with her daughter, were placed in a room separate from the defendant. Tr. I at 192. During that time, Officer White and other officers told her that she and her daughter may not be released unless the defendant provided a written statement in which he took responsibility for the items recovered from the car. Tr. I at 193-93. Later, she testified, the defendant was brought into the room and she spoke to him about what he should do. Tr. I at 193. After speaking with the defendant, according to Ms. Levayan, the officers told the defendant what to write in the written statement, and he wrote it out and signed the statement. Tr. I at 194. Later that evening, she testified that her daughter was released and she was released the next morning. Tr. I at 190.

First, it is evident that Ms. Levayan's testimony does not corroborate the defendant's claim that he was threatened. While she testified that, at the scene of the arrest, one of the officers said to her that he was going to take her daughter to "BCW," nowhere in her testimony does she state that she saw or heard one of the officers threaten the defendant directly in this manner. Second, with respect to the officers' treatment of her, her testimony only established that they were being truthful with her. In fact, until the officers were certain that the defendant was claiming responsibility for the gun, they could not release her because she was in the car as well and the defendant could claim that the gun belonged to her. Finally, it is clear from Ms. Levayan's testimony that it was she, and not the officers, who encouraged the defendant to sign the written statement, after she expressed her concern for their daughter to him. Tr. I at 193.

31

**E.      DEFENDANT'S POST-<u>MIRANDA</u> WRITTEN STATEMENT SHOULD NOT BE SUPPRESSED BASED UPON HIS PRE-<u>MIRANDA</u> ORAL STATEMENTS**

Although not raised by the defendant in his affirmation or mentioned by defense counsel during the hearing, the defendant may argue that his post-<u>Miranda</u> written statement should be suppressed because the <u>Miranda</u> warning that preceded it was undermined by the defendant's pre-<u>Miranda</u> oral statements in which he admitted that the gun and the drugs belonged to him. There is no basis for such an argument because the defendant made his pre-<u>Miranda</u> admissions at the scene of the arrest and at the station house voluntarily and without any prompting by any of the officers.  As discussed above, the testimony of all three officers and the defendant established that the defendant was cooperative with the officers from the time of his arrest and was eager to provide a statement to the police so that his girlfriend and his daughter could be released.  There is nothing in the record to even suggest that the defendant's pre-<u>Miranda</u> oral admissions were the product of any coercion or pressure or that the officers attempted to subvert <u>Miranda</u> by obtaining a pre-warning oral confession in order to compel the defendant to provide a post-warning written confession.  Accordingly, any argument claiming that the defendant's post-<u>Miranda</u> written admission should be suppressed because he provided pre-<u>Miranda</u> oral admissions should be denied.

1.      Applicable Law

In <u>Oregon</u> v. <u>Elstad</u>, 470 U.S. 298 (1985), the Supreme Court held that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" with respect to subsequent statements that the suspect makes after receiving <u>Miranda</u> warnings.  <u>Id.</u> at

314. Rather, "the admissibility of any subsequent statement should turn in these circumstances solely on whether it [was] knowingly and voluntarily made." Id. at 309. Therefore, a court must consider whether the circumstances surrounding a defendant's pre-Miranda statements were so coercive as to prevent him from making a subsequent knowing and voluntary waiver of his rights, thereby requiring the suppression of his post-Miranda confession. See id. at 309-14; see also Missouri v. Seibert, 542 U.S. 600, 611-12 (2004) (plurality opinion) ("The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as Miranda requires."); Tankleff v. Senkowski, 135 F.3d 235, 244 (2d Cir. 1998). While all custodial interrogations inherently involve "serious pressures," Tankleff, 135 F.3d at 244, in determining the voluntariness of a defendant's post-Miranda confessions, a court must examine the totality of the circumstances. See Tankleff, 135 F.3d at 245. Specifically, these circumstances include 1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police. United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991).

Recently, in Missouri v. Seibert, 542 U.S. 600 (2004), the Supreme Court revisited Elstad, but this time in the context of a two-step interrogation technique designed to undermine the Miranda warnings. In Seibert, the police interrogated a defendant in the station house without Miranda warnings as a deliberate tactic to elicit a confession. Id. at 613-614. Prior to bringing the defendant to the police station, the officers had awakened the defendant at 3 a.m. at a hospital where the defendant's son was being treated for burns. Id. at 604. The Court described that pre-Miranda interrogation, which lasted between 30 to 40 minutes, as "systematic, exhaustive, and managed with psychological skill." Id. at 604-05; 616. Fifteen to twenty

minutes after the defendant made an unwarned confession, police then read the defendant her Miranda rights.  During her subsequent statements, the police officers reminded the defendant of her prior unwarned confession when she made an inconsistent statement.  Ultimately the officers elicited the same confession from the defendant.  Id. at 616.

Five Justices of the Supreme Court held the statements inadmissible, but the Court did not issue a majority opinion.  A plurality of four justices advocated a multi-factor test to determine "whether Miranda warnings delivered midstream could be effective enough to accomplish their object."  Id. at 615.  The factors included: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first."  Id.

Justice Kennedy, in a concurring opinion, criticized the plurality's multi-factor test.  He stated that the multi-factor test "applies in the case of both intentional and unintentional two-stage interrogations and cuts too broadly."  Id. at 621-22.  He further stated that "Miranda's clarity is one of its strengths" and that the plurality's test "may serve to undermine that clarity."  Id. at 622.  He instead advocated "a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning."  Id.  Moreover, because Justice Kennedy concurred in the judgment on the narrowest grounds, his opinion represents the holding of the Court.[13]  Indeed,

---

[13]     It is well-settled that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the

the seven circuits that have addressed the issue have held that Justice Kennedy's opinion represents the holding of the Court.  U.S. v. Courtney, -- F.3d ----, 2006 WL 2482795, *5 (5th Cir. 2006); United States v. Ollie, 442 F.3d 1135, 1142 (8th Cir. 2006); U.S. v. Gonzalez-Lauzan, 437 F.3d 1128, 1136 at n.6 (11th Cir. 2006); United States v. Williams, 435 F.3d 1148, 1158 (9th Cir. 2006); United States v. Naranjo, 426 F.3d 221, 231-32 (3d Cir. 2005); United States v. Mashburn, 406 F.3d 303, 309 (4th Cir. 2005); United States v. Stewart, 388 F.3d 1079, 1086-87 (7th Cir. 2004);

Therefore, as Justice Kennedy explained, the principles of Elstad continue to govern the admissibility of postwarning statements unless law enforcement agents have deliberately employed a two-step strategy.  Seibert, 542 U.S. at 622.  In that case, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made."  Id.  Curative measures could include a substantial break in time between the prewarning statement and Miranda warning, or an additional warning that explains that the prewarning statement is inadmissible.  Id.  However, in Seibert, no such curative steps were taken and so the postwarning statements were excluded. Id.

While the Second Circuit has yet to apply Seibert, it has closely followed the principles enunciated in Oregon v. Elstad, 470 U.S. 298 (1985).  For example, in Tankleff v. Senkowski, 135 F.3d 235, 244 (2d Cir. 1998), the police questioned a seventeen-year-old defendant for five and one-half hours about the murder of his parents.  Id. at 240.  During the final two hours of the

---

narrowest grounds."  Marks v. United States, 430 U.S. 188, 193 (1977) (quotation marks omitted).

interrogation, the defendant was subjected to increasingly hostile questioning, which included

the detectives telling the defendant that his story was "ridiculous" and "absurd." Id. at 244. In

addition, the detectives falsely told the defendant that his father had woken from a coma and

accused the defendant of the attack. Id. The detectives later administered Miranda warnings and

the defendant confessed. Id. at 241.

The Court of Appeals determined that, while the "issue is a close one," the police

interrogation "barely did not entail that degree of coercion that would irredeemably taint

Tankleff's 'second' Mirandized confession." Tankleff, 135 F.3d at 245. The Court also noted

that: "Furthermore, and crucially important, there is no indication in the record that Tankleff did

not understand his rights once he was given the warnings or that his subsequent waiver of those

rights was anything but knowing and voluntary." Id.

Likewise in Parsad v. Greiner, 337 F.3d 175, 183-85 (2d Cir. 2003), the Court of Appeals

determined that the officers' pre-Miranda questioning did not impermissibly coerce the

defendant's post-Miranda confession. In Parsad, the police asked the defendant, who had been

drinking alcohol that day and who had not been Mirandized, intermittent questions about the

crime. Parsad, 337 F.3d at 178, 184. The questioning occurred at the precinct over the course

of three and one-half hours. Id. During this time, the detective confronted the defendant with

inconsistencies in his story. Id. The defendant subsequently was advised of his Miranda rights

and made a confession. Id. The Second Circuit examined the totality of the circumstances and

concluded that the defendant's post-Miranda statements to the police were voluntary and

36

uncoerced. Id. at 184-85.[14]

        2.    Discussion

The facts as set forth in the defendant's affirmation and testimony do not support his claim that he was coerced into waiving his Miranda rights and providing a written statement. Furthermore, even assuming they are true, the facts as the defendant alleges them are a far cry from the pre-Miranda interrogations to which the defendants in Tankleff and Parsad were subjected, and which the Court of Appeals determined were not coercive. The most obvious difference between the facts of those cases and the present one is that the officers in both Tankleff and Parsad extensively questioned the defendants about the crimes prior to advising them of their Miranda rights. By contrast, there is no evidence here that the officers interviewed the defendant about the gun and the drugs prior to advising him of his Miranda rights.[15] In fact,

---

    [14]    Other Circuits are in accord that a defendant's post-Miranda confession is generally admissible despite prior questioning in violation of the Miranda rule. See, e.g., United States v. Esquilin, 208 F.3d 315, 321 (1st Cir. 2000) (second confession made during same interrogation admissible because first confession voluntary and second confession given after thorough administration of Miranda warnings); United States v. Garcia-Abrego, 141 F.3d 142, 169-70 (5th Cir. 1998) (second confession made after being given doses of valium and blood pressure medication admissible because it was not tainted fruit of first voluntary confession given without valid Miranda warning); United States v. Johnson, 351 F.3d 254, 263 (6th Cir. 2003) (second confession admissible where substance of unwarned first confession made voluntarily by defendant identical to second statement after Miranda warnings); United States v. Gupta, 183 F.3d 615, 618 (7th Cir. 1999) (second confession admissible after Miranda warnings because initial statements to INS inspector voluntarily given); United States v. Villalba-Alvarado, 345 F.3d 1007, 1013 (8th Cir. 2003) (second confession after Miranda warnings admissible because first unwarned confession not compelled and second confession voluntary); United States v. Orso, 266 F.3d 1030, 1039-40 (9th Cir. 2001) (second confession admissible after Miranda warning given because initial confession was voluntarily given); United States v. Rith, 164 F.3d 1323, 1332033 (10th Cir. 1999) (post-Miranda incriminating statements admissible because pre-Miranda incriminating statements voluntarily made).

    [15]    Lieutenant McMahon and Sergeant Kivlehan testified that, at the scene of the arrest, Lieutenant McMahon asked the defendant about the weapon in the car that the defendant

because the defendant was so eager to provide a statement, Lieutenant McMahon explained to

the defendant that he could not take a statement from him until he <u>Mirandized</u> him.  Tr. III at 82.

Simply put, the testimony at the hearing established that the defendant provided an unprompted

oral admission to Officer White shortly after being arrested and was cooperative with the officers

from the time of his arrest through the time he provided them with a written statement.  There

was no reason for the officers to threaten or coerce him into giving a written statement.  It was

the defendant, not the officers, who wanted Ms. Levayan to be released.  It simply makes no

sense that the officers would have to threaten the defendant to memorialize a statement that (1)

he had made voluntarily and without prompting immediately after his arrest, and (2) would

further his expressed interest to have his girlfriend and his child released.

Moreover, the facts as set forth in the defendant's affirmation and testimony make it

abundantly clear that the environment in which he provided his oral and written statements was

not coercive.  Unlike in <u>Tankleff</u> and <u>Parsad</u>, where the officers confronted the defendants about

inconsistencies in their stories, Forestier does not allege that the officers in this case did any such

thing.  In addition, unlike in <u>Tankleff</u>, where the officers deliberately lied to the defendant about

the defendant's father accusing the defendant of the crime, the officers in the present case made

---

had mentioned to Officer White earlier.  Tr. III at 12, 80.  This questioning followed the
defendant's unprompted statement to Officer White and does not constitute interrogation under
<u>Miranda</u> in any event because it fits clearly within the public safety exception to <u>Miranda</u>.  <u>See</u>
<u>United States</u> v. <u>Estrada</u>, 430 F.3d 606, 609-14 (2d Cir. 2005) (holding that public safety
exception applies where the questioning relates to an objectively reasonable need to protect the
police or the public from immediate danger, and is not solely intended to elicit testimonial
evidence from a suspect).  In addition, Lieutenant McMahon testified that he did not ask the
defendant about the gun and the drugs during his initial conversation with him at the station
house.  Tr. III at 82-83.  The defendant did not offer any testimony to refute Lieutenant
McMahon on this point.

no false statements to Forestier.  Moreover, Forestier makes no claim that he was exposed to repeated or prolonged questioning prior to being advised of his rights.  Nor is there any allegation that the officers were hostile or abusive toward him, that the officers used ruses in order to induce him to talk, or that Forestier suffered any physical or psychological deprivation or was threatened or otherwise intimidated by the officers.

Finally, even assuming, as the defendant claims, that the officers told the defendant that his girlfriend and his child would not be released unless he claimed responsibility for the gun and the drugs, such statements would not render his Miranda waiver involuntary.  The Second Circuit has repeatedly held that statements by law enforcement regarding the benefits of cooperation do not constitute coercion and do not vitiate a Miranda waiver.  See United States v. Gaines, 295 F.3d 293, 299 (2d Cir. 2002) (vague promises of leniency are just one factor to be considered but do not, without more, amount to coercion); United States v. Ruggles, 70 F. 3d 262, 265 (2d Cir. 1995) ("statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive"); United States v. Bye, 919 F.2d 6, 9-10 (2d Cir. 1990) (mere mention of possible sentence facing defendant and benefits of cooperation does not convert otherwise proper encounter between police and accused into coercive and overbearing experience); United States v. Guarno, 819 F.2d 28, 31 (2d Cir. 1987) ("a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials"); United States v. Alvarado, 882 F.2d 645, 649-50 (2d Cir. 1989).  Accordingly, the testimony makes clear that the defendant was not improperly interrogated following his arrest and he was not threatened or coerced into providing either an oral or a written admission.  Moreover, even if the defendant provided the written statement with the hope

or expectation of receiving a benefit, namely the release of his girlfriend and his child, the

written statement was not involuntary or coerced.

## **CONCLUSION**

The officers had probable cause to arrest the defendant and thus his arrest did not violate

the Fourth Amendment.  The defendant's written statement was provided voluntarily after a

knowing and voluntary waiver of his <u>Miranda</u> rights.  Accordingly, the defendant's motion to

suppress evidence should be denied.


Dated: New York, New York
       September 25, 2006


                         Respectfully submitted,

                         MICHAEL J. GARCIA
                         United States Attorney

              By:        /s/ Brendan R. McGuire
                         Brendan R. McGuire
                         Assistant United States Attorney
                         United States Attorney's Office
                         Southern District of New York
                         1 St. Andrew's Plaza
                         New York, New York 10007
                         (212) 637-2220 (phone)
                         (212) 637-2387 (fax)

<u>**CERTIFICATE OF SERVICE**</u>

Brendan R. McGuire deposes and says:

That he is employed in the Office of the United States Attorney for the Southern District of New York; and

That on September 25, 2006, he caused to be served a copy of the foregoing Memorandum of Law of the United States of America in Opposition to Defendant's Motion to Suppress Evidence by Hand Delivery on:

Roland Thau, Esq.
Federal Defenders of New York, Inc.
52 Duane Street
New York, NY 10007

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. Section 1746.

<u>Brendan R. McGuire</u>
Brendan R. McGuire

Dated:        September 25, 2006
             New York, New York