**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York  10007*

July 6, 2007

BY ECF and HAND DELIVERY

The Honorable Kenneth M. Karas
United States District Judge
500 Pearl Street, Room 920
New York, NY 10007

      Re:    **United States v. Vito Forestier**
            **05 Cr. 1280 (KMK)**

Dear Judge Karas:

      This matter is scheduled for sentencing on July 13, 2007, at 12:00 p.m.  The Government respectfully submits this letter to respond to the defendant's sentencing submission dated June 29, 2007, in which the defendant argues for a sentence of 61 months's imprisonment.  In his submission, the defendant claims such a sentence is warranted because:  (I) he is a drug addict; (ii) the gun found in his possession was one of many items found in his car; and (iii) he should receive credit for his minimal criminal record.  For the reasons set forth below, the Government respectfully requests that the Court deny the defendant's request, and sentence the defendant to a term of imprisonment within the United States Sentencing Guidelines ("U.S.S.G.") range of 138 to 157 months.

**Factual Background**

      At trial, the evidence established that, on November 6, 2005, Vito Forestier was arrested in the Bronx, New York, by the New York City Police Department ("NYPD") after an NYPD officer observed an open glassine of heroin on the armrest of the driver's-side door of the car Forestier was driving.  At the scene, without being questioned, Forestier stated that he had money in the car and that he may have a weapon in the car as well.  Thereafter, the NYPD found a loaded 9 mm handgun in a bag in the car along with $19,000 in cash.  The $19,000 in cash consisted of 190 $100 bills.

      After Forestier was taken back to the 46th Precinct Station House, he was searched and 40 glassines of heroin were found in his buttocks.  Moreover, during an inventory search of the car, the NYPD recovered a bulletproof vest and four cellphones.  In addition, three more glassines of heroin were found stored in one of the cellphones.  Thereafter, Forestier was advised of and waived his *Miranda* rights and provided a written statement in which he admitted

1

that the drugs, the gun and the bulletproof vest belonged to him. With respect to the cash, Forestier stated that $5,000 of it was his and $14,000 of it belonged to his girlfriend who was also in the car at the time of his arrest.

## Procedural Background

Based on the above-described evidence, Forestier was charged in an indictment with distributing and possessing with intent to distribute heroin, in violation of 21 U.S.C. §§ 812, 841(a) and (b)(1)(c), and possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c). The indictment also contained a forfeiture allegation, which charged forfeiture of any and all property constituting or derived from any proceeds Forestier obtained from the alleged narcotics violation, and any and all property used to commit or to facilitate the commission of the narcotics violation.

Forestier moved to suppress the evidence found in the car as well as his post-arrest statements. After a hearing conducted on June 6, 2006, July 5, 2006, and August 23, 2006, and post-hearing argument on October 13, 2006, the Court denied both motions in an oral decision on December 6, 2006. The Court based its ruling primarily on the credibility of the witnesses, finding the Government's law enforcement witnesses more credible than the defendant and his wife, Yvonne Lavayan.

Trial commenced on February 6, 2007, and concluded on February 13, 2007, when a jury returned a verdict of guilty of both counts of the Indictment. At trial, the Government presented the testimony of five witnesses, and introduced into evidence a number of exhibits and stipulations. The witnesses included four of the NYPD officers who participated in the arrest and processing of the defendant; and a Special Agent with the Drug Enforcement Administration who testified as an expert in the practices of heroin users and dealers. The defense presented three witnesses, including the defendant and Ms. Lavayan.

The Probation Department's Pre-Sentence Report ("PSR") determined that the defendant's base offense level for Count One was 12 because he possessed less than 5 grams of heroin at the time of his arrest. See PSR at ¶ 25. Probation observed that Count Two requires a consecutive five-year term of imprisonment following any term of imprisonment on Count One. Id. at ¶ 24. Probation noted the Government's intention to seek a two-level enhancement for obstruction of justice and deferred the matter to the Court. Id. at ¶ 28. Accordingly, the Probation Department determined that the defendant had an offense level of 12 on Count One to be followed by a five-year term on Count Two, and that the defendant was in Criminal History Category I.

The Government's analysis differs from Probation's on two points. First, the Government believes that a two-level enhancement for obstruction of justice should apply because the defendant provided materially false testimony at the suppression hearing and at trial. Second, the Government believes that the base offense level for Count One should be 26, not 12, because the defendant's prior distribution of heroin constitutes relevant conduct for Count One.

**Argument**

I.    **The Applicable Guidelines Range is 138 to 157 Months**

Among the items recovered at the time of the defendant's arrest was $19,000 in $100 bills from a camera bag that also contained the defendant's loaded 9 mm handgun. As explained in the Government's forfeiture submission, dated March 26, 2007, which is attached as Exhibit A, the Government maintains that the $19,000 in cash constitutes the proceeds of the defendant's heroin sales. By a conservative estimate, the street value of one kilogram of heroin is $60,000. Thus, to earn $19,000, the defendant must have sold approximately 300 grams of heroin. This calculation is supported by information provided by a confidential informant (the "CI"), described in more detail below, who has informed the Government that he sold the defendant more than one kilogram of heroin during the year preceding the defendant's arrest, and including the day of the defendant's arrest.

It is the Government's position that the defendant's distribution of 300 grams of heroin, corroborated by the $19,000 in cash, constitutes relevant conduct for Count One under Section 1B1.3(a)(1)(A) of the Sentencing Guidelines ("U.S.S.G."). Therefore, the base offense level for Count One is 26 under U.S.S.G. § 2D1.1(7). In addition, the Government requests that the Court impose a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 because the defendant provided materially false information while testifying under oath at the suppression hearing and at trial. Accordingly, the base offense level for Count One is 28.

Because the defendant is in Criminal History Category I, the applicable Guidelines Range for Count One is 78 to 97 months. Count Two requires a mandatory consecutive term of 60 months. As a result, the applicable Guidelines Range for Counts One and Two is 138 to 157 months.

II.   **Forestier's Prior Heroin Distribution Constitutes Relevant Conduct For Count One**

The Court should consider the defendant's prior heroin distribution as relevant conduct for Count One. Although the Government has evidence that the defendant distributed more than one kilogram of heroin in the year prior to his arrest, the Government merely seeks a base offense level commensurate with the sale of 300 grams of heroin. The Government believes that this amount, corroborated by the $19,000 in cash recovered from his car at the time of his arrest, represents a fair and reasonable approximation of the defendant's prior conduct.

A.    <u>Applicable Law</u>

The Sentencing Guidelines provide that "in a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction." U.S.S.G. § 1B1.3 Background. Based upon the Sentencing Guidelines, the Second Circuit has distinguished "same course of conduct" from "common

scheme or plan." United States v. Perdomo, 927 F.2d 111, 114 (2d Cir. 1991). The former is broader because "same course of conduct" does not require that a connection be established among the drug trafficking occasions in terms of participants or overall plan. United States v. Shonubi, 998 F.2d 84, 89 (2d Cir. 1993). Thus, beginning with the more specific of the two concepts, a "common scheme or plan" includes conduct that involves the same participants or the same types of transactions. Id. As the Sentencing Guidelines provide, a "common scheme or plan" requires that the offenses "be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3, Application Note 9(A).

If offenses do not qualify as a common scheme or plan, they may still qualify as part of the same course of conduct "if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." See United States v. Dixon, 175 Fed. App. 384, 385 (2d Cir. 2006) (unpublished) (quoting U.S.S.G. § 1B1.3, Application Note 9(B)). The following factors should be considered: the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. Id. Thus, the course of conduct inquiry should focus on whether the defendant "has engaged in an identifiable 'behavior pattern' of specified criminal activity." United States v. Burnett, 968 F.2d 278, 280 (2d Cir. 1992); see also United States v. Santiago, 906 F.2d 867, 872 (2d Cir. 1990).

In Burnett, the defendant pled guilty to one count of possessing, with intent to distribute, marijuana, based on a single purchase of a 22 pound load of marijuana. Burnett, 968 F.2d at 279. At sentencing, in calculating the defendant's base offense level, the district court included 3 kilograms of cocaine that a Government witness claimed he had sold to the defendant on two occasions several months before he sold him the marijuana. Id. The relevant conduct increased the defendant's base offense level from level 16 to level 28. Id. On appeal, the Second Circuit held that the defendant's two cocaine purchases from the same supplier as the marijuana was part of the same course of conduct. Id. at 280. "Burnett's participation in two narcotics transactions during the same year as the offense of conviction has sufficient similarity and temporal proximity to the marijuana offense to constitute . . . a pattern of behavior." Id.

As the Court is aware, disputed facts relevant to sentencing determinations under the Sentencing Guidelines need only be proven by a preponderance of the evidence. See United States v. Cordoba-Murgas, 233 F.3d 704, 708 (2d Cir. 2000). In making such factual findings, a "sentencing court remains entitled to rely on any type of information known to it." United States v. Concepcion, 983 F.2d 369, 387 (2d Cir. 1992) (citing United States v. Carmona, 873 F.2d 569, 574 (2d Cir. 1989)). Thus, in rendering sentence, a district court may rely upon information gleaned from the evidence adduced at trial, see United States v. Sisti, 91 F.3d 305, 312 (2d Cir. 1996), as well as hearsay evidence and uncharged conduct, so long as the Government has proven that conduct by a preponderance of the evidence. See United States v. Reese, 33 F.3d 166, 174 (2d Cir. 1994) ("[W]hen determining sentence, a sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal

activity resulting in acquittal.").

    B.    <u>Discussion</u>

As noted above, the CI has informed the Government that he sold the defendant more than one kilogram of heroin over the course of the year leading up to the defendant's arrest. The CI, who was referred to as "Kenny" at trial and who has provided reliable information to the NYPD in the past, has told the Government that he sold approximately 50 bundles of heroin per week to the defendant for approximately one year.[*] According to the CI, he sold heroin to the defendant approximately twice a week in the same area of the Bronx, and the heroin was packaged in bundles of ten glassines. Moreover, the CI states that he sold approximately four bundles to the defendant on November 6, 2005 in the Bronx. Finally, according to the CI, the defendant told the CI about heroin customers that he had in the New York and New Jersey metropolitan area to whom he sold bundles of heroin.

The Government is not seeking a relevant conduct enhancement on the basis of the CI's information alone. The $19,000 in cash in $100 bills found in the bag with the defendant's loaded 9 mm handgun serves as compelling corroboration of the CI. As discussed in more depth in the Government's forfeiture submission, the evidence at trial, including the defendant's testimony, conclusively established that he was in the business of selling heroin, and that the $19,000 in cash represented the proceeds of his heroin sales. <u>See</u> Ex. A at 3-5. Both at the hearing and at trial, the defendant and Ms. Lavayan were unable to establish a legitimate source for the cash, and this Court described their explanation for the cash at the hearing as "difficult to believe." <u>See</u> Transcript of the Court's Decision, dated December 6, 2006, at 4, attached as Exhibit B. Thus, the preponderance of the evidence demonstrates that the $19,000 in cash was the defendant's proceeds from his distribution of the bundles of heroin that he bought from the CI.

Accordingly, the CI's information, corroborated by the $19,000 in cash, establishes that the defendant's prior heroin distribution and his possession, with the intent to distribute, of the 43 glassines of heroin on November 6, 2005, qualify as both a "common scheme or plan" and the "same course of conduct." This conduct represents a common scheme or plan because it is substantially connected by several common factors. It involves (I) the same drug supplier; (ii) selling the same type of drug; (iii) in the same type of packaging; (iv) on a weekly basis; (v) for a period of approximately one year; (vi) in the same general location. This clearly reveals a significant and undeniable connection between participants and occasions. <u>See</u> <u>Shonubi</u>, 998 F.2d at 89.

---

    [*]    There are typically 10 glassines of heroin per bundle, as was the case with the four bundles recovered from the defendant. The CI's estimate of 50 bundles per week for one year yields approximately 2,500 bundles or 25,000 glassines of heroin sold to the defendant. According to a law enforcement estimate, 20 glassines of heroin typically contain approximately 1 gram of heroin in total. Thus, 20,000 glassines contain approximately 1 kilogram of heroin.

Similarly, the defendant's prior distribution must be characterized as the same course of conduct. Indeed, the defendant's November 6, 2005 purchase of four bundles was only the most recent in a series of regular heroin purchases that he had made from the CI over the course of the past year. The defendant purchased the same drug from the same supplier twice a week for a year right up until the day of his arrest. In the process, he engaged in a pattern of criminal behavior that fits squarely within this Circuit's definition of the "same course of conduct." See Burnett, 968 F.2d at 280.

In fact, the defendant's own trial testimony corroborates the CI's information. The defendant admitted at trial that Kenny supplied him with bundles of heroin in 2005. See Tr. Tran. at 507. He also acknowledged meeting with Kenny to buy drugs on three occasions, and testified that he had purchased the 40 glassines of heroin that were found on him from Kenny in the Bronx shortly before his arrest. Id. at 510-511.

Accordingly, based upon the testimony of the CI, which is corroborated by the $19,000 in cash and the defendant's testimony, the Government submits that the defendant's prior heroin distribution is part of both a common plan or scheme and the same course of conduct, and should be considered relevant conduct for Count One.

### III.   Forestier Obstructed Justice By Committing Perjury During His Suppression Hearing Testimony and His Trial Testimony

The Court should apply a two-level upward adjustment for obstruction of justice because the defendant provided materially false information under oath during his hearing testimony and his trial testimony. The defendant testified on two occasions in connection with this case: first, on June 6, 2006 in support of his motions to suppress, and then on February 8-9, 2007 at trial. As set forth below, the defendant committed perjury and obstructed justice on both occasions.

    A.    <u>Suppression Hearing Testimony</u>

In support of his motions to suppress physical evidence and his written post-arrest statement, the defendant submitted a sworn affirmation in which he claimed, among other things, that (1) "[t]here was absolutely no [glassine] in the door console nor anywhere visible in [the] car," and (2) he provided the written post-arrest statement only after the police told him that his wife would not be released and that their child would be put into the custody of the state. See Affirmation of Vito Forestier, dated March 20, 2006, at ¶¶ 4, 5, attached as Exhibit C. On the basis of this affirmation, the Court granted the defendant's request for a suppression hearing.

At the hearing, the defendant provided sworn testimony that bolstered the claims in his affirmation. He testified that there were no drugs in the recess of the driver's door handle at the time of his arrest. See Transcript of Suppression Hearing, dated June 6, 2006, at 106. He further testified that he was not advised of his Miranda rights on the way to the station house or before he was interviewed. Id. at 156. He also stated that the officers threatened that, if he did

not sign a written statement claiming responsibility for everything in the car, his wife and his child would not be released. Id. at 122-25. In addition, he testified that he wrote only some of the written statement, and some of the handwriting that appeared in the written statement was not his. Id. at 159-62.

As the Court ultimately found, the defendant's testimony, and the affirmation upon which it was based, were simply not believable. The defendant's testimony was completely undermined by the physical evidence, including the glassine recovered from the car door and his written statement, as well as by the credible testimony of the officers who participated in the defendant's arrest. Indeed, in its oral ruling on the motions, the Court recognized that the defendant had not provided entirely truthful testimony at the hearing, and questioned the defendant's credibility on certain issues that were not only material, but critical, to the defendant's motions to suppress.

At the outset of its decision, the Court announced that the defendant's motions were denied principally on the basis of the Court's credibility determinations. See Ex. C at 3. The Court concluded that the Government's witnesses, and Officer Joseph White in particular, were more credible than the defendant and Ms. Levayan. Focusing first on the demeanor of the witnesses, the Court noted that, unlike Officer White, the defendant and Ms. Levayan did not appear to be witnesses who were being truthful and described them as being "far more evasive on cross-examination." Id. at 3. In addition to demeanor, the Court also reasoned that the defendant's testimony did not contain the same "ring of truth" as Officer White's testimony. Id. at 4 ("Now, some of the testimony from Mr. Forestier and Ms. Lavayan did not have a ring of truth to it. The explanation about money was, frankly, very difficult to believe."). Moreover, the Court recognized that the defendant had a clear motive to lie as he was aware of the importance of the search and his post-arrest statement to the charges against him. Id. at 8.

The Court also made specific findings with respect to the defendant's testimony regarding his written post-arrest statement. The Court was particularly emphatic regarding the defendant's testimony that he had a clear memory of most of the events of the day of his arrest up to the point of his written statement. After noting that the defendant denied writing a portion of the statement, the Court stated: "That simply wasn't credible. I think that is something that was quite striking to the Court." Id. at 9. The Court then explicitly found that the defendant's claim that the written statement was coerced by the threats of the officers also was not credible. Id. at 10.

    B.    <u>Trial Testimony</u>

In his sworn testimony at trial, the defendant maintained two of his central claims from the suppression hearing – that there was no glassine in the armrest next to the driver's seat of the car, and the officers coerced him to provide the written post-arrest statement. First, with respect to the glassine, the defendant testified that, while the police may have said they found a glassine in his armrest, "[i]t never was there." Trial Transcript, dated February 9, 2007, at 563. Second, he reiterated that the officers told him to take responsibility for the contraband, and that

he provided the written statement only because the officers said that Ms. Lavayan would not be released otherwise. Id. at 472.

This testimony was, quite simply, false. Moreover, the defendant offered this testimony despite the considerable doubts previously expressed by the Court, including the Court's specific finding that the defendant's coercion claim was not credible. It is worth noting, however, that the defendant did alter some of his prior testimony after hearing the Court's ruling. At trial, he no longer claimed that he had not written portions of the written statement and that some of the handwriting was not his. Instead, he, for the first time, told the truth about the statement, and finally admitted that he had written and signed it. Id. at 468.

Most significantly, the defendant provided materially false testimony about the two central issues at trial. First, with respect to the drug distribution charge, he testified that he did not intend to "give or sell or lend" any of the drugs found in his possession. Id. at 478. Second, he testified that he carried a gun only because he felt scared after having been shot in the past. Id. at 456. The evidence presented at trial established beyond a reasonable doubt that this testimony was false. In fact, as the jury found, the defendant intended to sell at least some of the 43 glassines found in his possession. Rejecting the defendant's second claim, the jury also found that he carried the loaded 9 mm semiautomatic hand gun in furtherance of his drug trafficking. The defendant's lies about his intent to use all 43 glassines of heroin and his need for a gun due to a past shooting are exposed by the overwhelming evidence in this case, which includes the 43 individually wrapped glassines, the loaded gun, the bullet proof vest, the $19,000 in $100 bills, and the defendant's three cell phones found in his car.

    C.    Applicable Law

The Sentencing Guidelines mandate a two-level upward adjustment "[i]f . . . the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and . . . the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1. This adjustment applies when a defendant has provided "materially false information to a judge or magistrate." Id. comment. n. 3(f). Information is "material" when, "if believed, [it] would tend to influence or affect the issue under determination." Id. comment. n. 6.

Before imposing an obstruction enhancement, "the district court must find that the defendant 'consciously act[ed] with the purpose of obstructing justice.'" United States v. Lincecum, 220 F.3d 77, 80 (2d Cir. 2000) (quoting United States v. Case, 180 F.3d 464, 467 (2d Cir.1999)) (internal quotation marks omitted). "The court must 'make independent findings necessary to establish a willful' attempt to obstruct justice, but it is sufficient if the court makes a finding that 'encompasses all of the factual predicates for a finding of perjury.'" Id. (quoting United States v. Dunnigan, 507 U.S. 87, 95 (1993)). In other words, the court must "find that the defendant (1) wilfully (2) and materially (3) committed perjury, which is (a) the intentional (b) giving of false testimony © as to a material matter." United States v. Zagari, 111 F.3d 307, 329

8

(2d Cir. 1997). However, where the district court finds that the defendant "has clearly lied" in a statement made "under oath," the "court need do nothing more to satisfy [United States v. Dunnigan, 507 U.S. 87 (1993)] than point to the obvious lie and find that the defendant knowingly made a false statement on a material matter." United States v. Williams, 79 F.3d 334, 337-38 (2d Cir. 1996).

Once a district court finds that a defendant committed perjury, the two-point upward adjustment is mandatory. See United States v. Ortiz, 251 F.3d 305, 305-06 (2d Cir. 2001); United States v. Ruggiero, 100 F.3d 284, 293-94 (2d Cir. 1996).

    D.    Discussion

This case satisfies all the criteria for imposition of the adjustment for obstruction of justice. The defendant lied in statements made under oath, the false statements were material, and they were made willfully and intentionally in an effort to deceive the Court and the jury.

First, the defendant clearly made statements under oath, both at the hearing and at trial, that were false. In fact, as described above, the Court explicitly did not credit certain critical portions of the defendant's hearing testimony. The defendant's assertions in his affirmation, at the hearing and at trial that there was no glassine in the door console and that the officers coerced him into providing the written statement were squarely refuted by the credible testimony of the arresting officers, the physical evidence, and the defendant's own demeanor while testifying. Similarly, his claims at trial that he did not intend to sell any of the 43 glassines of heroin and that he possessed a gun because he had been shot in the past were not found to be truthful by the jury.

Second, the false statements were clearly material to the Court's inquiry at the suppression hearing and to the jury's inquiry at trial. As the Court recognized in its post-hearing ruling, the defendant understood the central role the search played in the case against him, and thus he had a motive to lie. The defendant's statements at the hearing that there was no glassine in the door console went directly to one of the critical issues at the hearing: whether the police had probable cause to arrest the defendant. Moreover, his claims that he was not advised of his Miranda rights and the officers coerced him to make the written statement bore on another of the critical issues at the hearing: whether the written statement was provided voluntarily. Similarly, his testimony at trial regarding his intent with respect to the drugs and the gun constituted his primary defense to the two charges against him. Clearly, the defendant was hoping that the jury would believe his lies and acquit him of both charges in the Indictment.

Third, the evidence also demonstrates that the defendant's false statements were unquestionably willful, and not the result of confusion, mistake, or faulty memory. The fact that the defendant repeated the untrue statements about the glassine in the door console and the written statement at the hearing and later at trial demonstrates the willful nature of his conduct and belies any attempt to claim that he was confused or that his testimony was simply a mistake. As noted above, his testimony regarding his intent with respect to the drugs and the gun served as his primary trial defense, and the defendant cannot now claim that such a strategy was

inadvertent. Furthermore, the defendant's testimony was presented during questioning by highly competent, experienced counsel, who undoubtedly debriefed his client in order to prepare for trial. Given the importance of the events described in his testimony, both at the hearing and at trial, as well as the defendant's obvious incentive to prevail at both proceedings, it is simply inconceivable that his false statements were anything but an intentional effort to mislead this Court and the jury.

Accordingly, the defendant's offense level should be enhanced by two levels for obstruction of justice pursuant to U.S.S.G. § 3C1.1.

**IV.    The 3553(a) Factors Do Not Counsel In Favor Of Leniency**

As the Court is well aware, Title 18, United States Code, Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2)." That sub-paragraph sets forth the following purposes:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range under the Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. See 18 U.S.C. § 3553(a).

Here, the Government argues that the application of the Guidelines to this defendant results in a sentencing range of 138 to 157 months. The Court should strongly consider that Guidelines range in imposing sentence.

    A.    <u>The History and Characteristics of the Defendant Do Not Merit a Non-Guidelines Sentence</u>

The defendant argues that the Court should impose a sentence of 61 months based upon his history and characteristics. Specifically, he contends that his history and characteristics counsel for leniency because he is a drug addict, the loaded gun was one of many items found in

his car, and he is "basically a first offender." The Government submits that these reasons do not provide a basis for a non-Guidelines sentence.

First, drug abuse is ordinarily not a basis for departure or for a non-Guidelines sentence. See U.S.S.G. § 5H1.4. Moreover, as described in the defendant's submission, his drug abuse is not present to such an extraordinary degree that a non-Guidelines sentence is warranted. The fact that the defendant is a drug dealer who also happens to use drugs is not unusual nor should it militate in favor of a non-Guidelines sentence.

Second, with respect to the loaded gun, the defendant has a history of involvement with guns, as described below. The fact that there were other items in the car hardly excuses the presence of a loaded semiautomatic handgun. Moreover, the defendant is correct that there were other items in the car in addition to the gun. They included a bullet proof vest, $19,000 in cash, 43 glassines of heroin, and multiple cell phones – all the tools of the defendant's drug trade. Finally, the Court should consider where the loaded gun was found – on the same back seat where the defendant's five-year old daughter had been sitting for the previous four to five hours.

Finally, the claim that the defendant is "basically a first offender" is belied by the defendant's criminal history and should be swiftly rejected. As a starting point, the defendant has a 1998 conviction for disorderly conduct, and witnesses in the area observed that the defendant and another individual were selling drugs prior to his arrest. See PSR at ¶ 36. More importantly, however, as the Court is aware from the Government's pre-trial 404(b) motion, this 1998 arrest is not the defendant's only other arrest. The defendant was arrested on January 16, 1996 for the armed robbery of a bodega in the Bronx, New York during which the defendant was armed with a knife, while one of his accomplices was armed with a handgun. The Government had a witness to this armed robbery available to testify at trial. The Government learned that the charges in this case were dropped when the victim received a death threat from one of the defendant's associates and, not surprisingly, ceased cooperating with law enforcement. In addition, on May 23, 2000, the defendant was arrested for his possession of a loaded 9 mm handgun that had been discharged inside an apartment in the Bronx, New York. This case was ultimately dismissed despite the police officer's observation of the defendant's possession of a gun.

While neither of these arrests resulted in convictions, they reveal that the instant case marks the third time that the defendant was arrested in connection with a gun-related crime. Moreover, this time he also had his bulletproof vest with him, which suggests that he may have been planning to use his gun or, as is common in the drug trafficking business, expected someone else to pull a gun on him. Thus, the defendant is hardly a "first offender," his possession of a loaded 9 mm, a bulletproof vest, and distribution quantities of heroin does not represent aberrant conduct, and he should not receive any credit for his prior record.

B.    The Guidelines Range Is Appropriate To Deter Others and To Protect the Public

The Government submits that a sentence within the Guidelines range of 138 to 157 months is necessary to sufficiently reflect the seriousness of these offenses, promote respect for the law, and afford adequate deterrence to criminal conduct. The defendant was a gun-toting drug dealer who made thousands of dollars selling heroin and thought nothing of driving around the Bronx with his wife and young daughter in the car, along with his loaded 9 mm handgun, bulletproof vest and $19,000 in cash. Moreover, he admitted to being high on heroin and cocaine while he drove his wife and daughter from one end of New York City to the other. The distribution of heroin and the possession of a gun in furtherance of that distribution are very serious crimes, which in this case could have resulted in serious injury or death.

## Conclusion

For all of these reasons, the Government respectfully requests that the Court impose a prison sentence within the 138 to 157 months range provided by the Guidelines.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By:    /s/Brendan R. McGuire
Brendan R. McGuire
Michael Q. English
Assistant United States Attorneys
(212) 637-2220 / 2594

cc:    Roland Thau, Esq. (by ECF and hand delivery)
Counsel for Vito Forestier

Kisha C. Singleton (by hand)
U.S. Probation